In re: the ESTATE OF James
E. BAKER, Deceased.

Terry Baker, Appellant–Respondent,

v.

Bert Baker, Personal Representative,
Appellee–Petitioner.

No. 02A05–0503–CV–155.

Court of Appeals of Indiana.

Nov. 23, 2005.

Jason M. Kuchmay, Federoff Law Firm, Fort Wayne, for Appellant.

David C. Van Gilder, Van Gilder & Trzynka, Fort Wayne, for Appellee.

## OPINION

SHARPNACK, Judge.

Terry Baker ("Terry") files this interlocutory appeal from the probate court's or-

der denying his motion to dismiss for lack of personal jurisdiction. Terry raises three issues, which we consolidate and restate as whether the probate court had personal jurisdiction over Terry. We affirm.

The relevant facts follow. Terry Baker and Bert Baker are the sons of James Baker. Bert lives in Indiana, and Terry lives in Georgia, where he owns and operates an assisted care facility called Your House. Prior to September 2002, James owned a house and lived in Allen County, Indiana. James owned and maintained three accounts (checking, savings, and "Liquid Gold savings") with Midwest America Federal Credit Union ("Midwest Credit Union") in Fort Wayne, Indiana. Appellant's Appendix at 70. James also owned a certificate of deposit account with Bank One in Fort Wayne.

In September 2002, Terry came to Indiana to take James to Georgia to live in his assisted care facility. James did not sell his house in Indiana. On September 27, 2002, while in Georgia, James appointed Terry as his attorney in fact by executing a written general power of attorney, which allowed Terry, among other things, to sign and issue checks and to deal with any real or personal property. Thereafter, Terry contacted Midwest Credit Union and Bank One to change the mailing address for the bank statements to his own business address at Your House.

While in Georgia, Terry wrote the following checks from James's Midwest Credit Union checking account: (1) $1,500.00 to Your House on September 1, 2002; (2) $1,500.00 to Your House on October 1, 2002; (3) $1,500.00 to Your House on November 5, 2002; (4) $83.40 to Verizon on November 15, 2002; (5) $57.88 to Directv on November 15, 2002; (6) $66.48 to Centennial Wireless on November 15, 2002; (7) $300.00 to Kroger Solutions for James's medicine on December 3, 2002; (8) $1,500.00 to Your House on December 5, 2002; (9) $5,000.00 to Your House as a "Loan" on December 19, 2002; (10) $2,500.00 to Your House as a "Loan" on December 22, 2002; (11) $925.00 to Met Life Auto and Home on January 10, 2003; (12) $306.37 to Kroger Solutions for medicine on February 18, 2003; (13) $4,000.00 to Chase Platinum Mastercard on April 5, 2003; (14) $5,400.00 to Your House on July 8, 2003; (15) $5,400.00 to Your House on October 1, 2003; (16) $11,000.00 to Terry's wife, Peggy Baker, as a "Gift" on December 8, 2003; (17) $11,000.00 to Terry as a "Gift" on December 8, 2003; (18) $11,000.00 to Bill Heard Chevrolet on December 1, 2003; and (19) $7,051.29 to Caldwell & Cowan Funeral Home on December 12, 2003. Appellant's Appendix at 93–94, 100–101. Terry also made the following transfers in James's Midwest Credit Union accounts: (1) $22,000.00 from James's savings account to his checking account on December 4, 2003; (2) $26,000.00 from James's savings account to his checking account on December 11, 2003; and (3) $10,000.00 from James's Liquid Gold savings account to his checking account on December 11, 2003.

On December 4, 2003, James and Terry met with an agent for Modern Woodman of America in Georgia, and James's Indiana Bank One certificate of deposit totaling $61,407.12 was transferred to Modern Woodmen to purchase an annuity. Terry was the beneficiary on the annuity.

On December 14, 2003, James died while in Georgia. In January 2004, Bert filed a petition for appointment of personal representative of James's estate with the Allen County probate court in Indiana, and the probate court appointed Bert as personal representative to administer James's estate. In February 2004, Terry signed a consent to unsupervised administration of

James's estate in the Allen County probate court.[1] In August 2004, Bert filed a petition to recover assets and alleged that Terry was in possession of property that belonged to James's estate. In the petition, Bert alleged that Terry had possession of funds totaling $125,534.09, which consisted of the checks that Terry wrote from James's checking account and the funds that were transferred from James's certificate of deposit into the annuity that was paid out to Terry after James's death.

In October 2004, Terry filed a motion to dismiss Bert's petition to recover the assets for lack of personal jurisdiction. Terry and Bert submitted affidavits and exhibits to support their respective arguments regarding jurisdiction. The probate court held a hearing on Terry's motion to dismiss, and Terry and Bert's attorneys provided argument. Thereafter, the probate court issued the following order denying Terry's motion:

\* \* \* \* \*

1. As evidenced by a multitude of financial transactions conducted by accessing the decedent's Indiana bank accounts, under TR 4.4, Terry Baker was doing business in the State of Indiana.

2. The cause of action, which the Personal Representative [Bert] is pursuing, arises out of those transactions.

3. The contacts to Indiana were initiated by Terry Baker and included the writing of checks and making of phone calls to an Indiana banking institution.

4. James Baker lived a majority of his life in Indiana. He spent only the last 15 months of his life in Georgia where he resided in an assisted living facility owned by Terry Baker. When he died, James Baker owned both personal and real property located in Indiana.

5. The estate is being administered in Indiana and Terry Baker has signed a Consent to Unsupervised Administration.

6. Indiana is a convenient forum in which to administer this estate.

Therefore, and based upon TR 4.4 and applicable case law, the Court finds the allegation of jurisdiction to be proper and denies the Motion to Dismiss.

Appellant's Appendix at 4. Pursuant to Ind. Rule of Appellate Procedure 14(B), Terry moved to certify the probate court's order, which the probate court granted. Thereafter, we accepted jurisdiction.

The sole issue is whether the probate court had personal jurisdiction over Terry. "Personal jurisdiction is a court's power to bring a person into its adjudicative process and render a valid judgment over a person." *Anthem Ins. Cos., Inc. v. Tenet Healthcare Corp.*, 730 N.E.2d 1227, 1231 (Ind.2000) (internal quotations and citation omitted). When a defendant argues a lack of personal jurisdiction, the plaintiff must present evidence to show that there is personal jurisdiction over the defendant. *Id.* However, the defendant ultimately bears the burden of proving the lack of personal jurisdiction by a preponderance of the evidence, unless the lack of jurisdiction is apparent on the face of the complaint. *Id.* The existence of personal jurisdiction over a defendant is a constitutional requirement in rendering a valid judgment, mandated by the Due Process Clause of the Fourteenth Amendment. *Id.* at 1237. When we review questions of whether personal jurisdiction

1. A copy of the consent to unsupervised administration is not included in Terry's Appendix.

exists, we employ a de novo standard of review. *Id.* at 1238.

[5] In determining whether an Indiana court has personal jurisdiction, a court must proceed with a two-step analysis. *Id.* at 1232. First, the court must determine if the defendant's contacts with Indiana fall under our equivalent of a "long-arm statute," Ind. Trial Rule 4.4. *Id.* at 1231–1232. Second, if the contacts fall under Ind. Trial Rule 4.4, the court must then determine whether the defendant's contacts satisfy federal due process analysis. *Id.* at 1232. We will review each prong of the analysis in turn.

### A. *Long Arm Statute—Indiana Trial Rule 4.4*

■ Regarding the first prong, Ind. Trial Rule 4.4(A) provides:

Acts Serving as a Basis for Jurisdiction. Any person or organization that is a nonresident of this state, a resident of this state who has left the state, or a person whose residence is unknown, submits to the jurisdiction of the courts of this state as to any action arising from the following acts committed by him or her or his or her agent:

(1) doing any business in this state;

\* \* \* \* \*

In addition, a court of this state may exercise jurisdiction on any basis not inconsistent with the Constitutions of this state or the United States.[2]

Terry argues that he never did business in Indiana because he never physically en-

tered Indiana and visited an Indiana bank and because the record contained no written communication between Terry and the Indiana banks that held James's accounts. Bert argues that Terry's numerous financial transactions with James's Indiana bank accounts, transfer of funds, and signing of the consent to unsupervised administration are sufficient to show that Terry was doing business in Indiana under Ind. Trial Rule 4.4. Bert relies on *Saler v. Irick,* 800 N.E.2d 960 (Ind.Ct.App.2003), to support his argument.

In *Saler,* we held that three out-of-state beneficiaries on three payable-on-death accounts, which included one money market account and two certificates of deposit, were doing business in Indiana when they completed and signed consents to transfer funds that authorized an Indiana bank to release the funds from the payable-on-death accounts to them. *Saler,* 800 N.E.2d at 964–966, 965 n. 1. One of the out-of-state beneficiaries had visited Indiana to remove the decedent's personal belongings and had visited a representative of the Indiana bank, but the other two out-of-state beneficiaries had never set foot in Indiana. *Id.* at 964. On appeal, the three beneficiaries argued that their actions did not constitute doing business in Indiana because the definition of business in Ind. Trial Rule 4.4 related more to "a continuous or regular activity for the purpose of earning a livelihood" or "employment … or commercial activity engaged in for gain or livelihood." *Id.* at 965 (citations omitted). We disagreed and noted that when interpreting the "doing any

---

**2.** This last sentence contained in Ind. Trial Rule 4.4(A) providing, "In addition, a court of this state may exercise jurisdiction on any basis not inconsistent with the Constitutions of this state or the United States[,]" was added to the Trial Rule 4.4 when it was amended effective January 1, 2003. *See LinkAmerica Corp. v. Cox,* 828 N.E.2d 388, 392 n. 2 (Ind.

Ct.App.2005). We have noted that by the addition of this sentence to Trial Rule 4.4(A), "Indiana's 'long-arm' jurisdiction now extends to the limit permitted by the Due Process Clause." *Glasscock v. Corliss,* 823 N.E.2d 748, 755 n. 4 (Ind.Ct.App.2005), *reh'g denied, trans. denied.*

business" factor under Ind. Trial Rule 4.4(A)(1), we should use "a more expansive definition of 'business.'" *Id.* We noted that such expanded definitions of "business" included that of an "affair" or "matter" or "a special task, duty, or function." *Id.* at 966 (citations omitted).

Here, the record reveals that between 2002 and 2003, Terry wrote nineteen checks that were drawn from an Indiana bank, Midwest Credit Union. Each of these checks required that Midwest Credit Union issue payment to the listed payee as directed by Terry, the drafter of the check. The evidence before us also reveals that Terry contacted Midwest Credit Union to change James's mailing address on his bank statements. Furthermore, Terry apparently contacted Midwest Credit Union on December 4, 2003 and December 11, 2003, in order to transfer a total of $58,000.00 from James's two savings accounts into his checking account.[3] In addition, the evidence reveals that ten days before James's death, Terry and James met with an agent for Modern Woodmen and afterwards James's Bank One certificate of deposit account that he opened in Indiana "was transferred to Modern Woodmen" to purchase an annuity, on which Terry was the beneficiary. Appellant's Appendix at 57. Finally, after Bert had been named as personal representative of James's estate in the Allen County probate court, Terry signed a consent to unsupervised administration of the estate that was filed with the probate court. Under *Saler*'s "more expansive definition of business," we conclude that Terry was doing business in Indiana.

■ Terry argues even if his alleged contacts that relate to the checks would be considered as doing business or would constitute sufficient minimum contacts, Bert may not pursue recovery of the value of the certificate of deposit through the Indiana probate court because James was the one who transferred the certificate of deposit to Modern Woodmen and that there was no evidence in the record to indicate that Terry had contact with Indiana as it relates to the certificate of deposit.

The evidence presented to the probate court, and thus, the evidence before us, consisted of a paper record. Terry's affidavit provides that on December 4, 2003, he and James "met with an agent for Modern Woodmen" and that "afterwards, [the] Bank One Certificate of Deposit ... was transferred to Modern Woodmen[.]" Appellant's Appendix at 57. Bert submitted a copy of the "Request for CD Transfer" that shows a signature for a "James E. Baker." *Id.* at 104. However, as noted above, the evidence also reveals that Terry obtained power of attorney over James's accounts in September 2002 and wrote checks from James's checking account from the time he obtained that power of attorney up until James's death, which was on December 14, 2003. Therefore, we conclude that there is some evidence in the record that Terry had some contact with

---

**3.** Terry argues that there is no evidence to show the manner that the December 2004 account transfers were effectuated or who made the transfers. The record before us reveals that after Terry took James to live in Georgia, Terry obtained power of attorney over James's accounts and wrote checks from James's checking account. The exhibits submitted to the probate court show that three transfers totaling $58,000.00 were made around one week before James's death. Given the facts that Terry had control over James's accounts and that money between James's accounts could not be transferred without some sort of contact with the bank (be it by phone, letter, or internet), we conclude that the evidence presented is sufficient to support the conclusion that Terry contacted the bank.

Indiana as it relates to the certificate of deposit and that would support the probate court's finding that Terry had "access[ed] [James's] Indiana bank accounts." Appellant's Appendix at 4. Furthermore, considering that this is a claim dealing with the assertion of Bert, as personal representative for James's estate, that Terry had misappropriated assets that belong to James's estate and considering that Terry has already consented to the unsupervised administration of James's estate in the Indiana probate court, we conclude that the probate court also had personal jurisdiction over Terry in relation to the certificate of deposit. *Cf. Saler,* 800 N.E.2d at 970–972 (holding that the probate court lacked personal jurisdiction under Ind. Trial Rule 4.4 over the defendant beneficiaries in regard to three annuities, which were not present in Indiana, because there was no evidence that the defendants did any acts connected to Indiana that were related to the annuities). Thus, Terry's contacts fall within Indiana's long-arm statute, and the first prong of the test of personal jurisdiction has been met. *See, e.g., Saler,* 800 N.E.2d at 965–966.

**B. *Federal Due Process***

 After finding a basis for jurisdiction under the long-arm statute, courts must turn to the second prong and examine whether asserting jurisdiction violates the Due Process Clause of the Fourteenth Amendment. *Anthem,* 730 N.E.2d at 1233. The United States Supreme Court has explained this to mean that a person must have certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. *Id.* (citing *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). The existence of personal jurisdiction depends on the nature and quality of the contacts with the forum, not a me-

chanical test. *Id.* Furthermore, contacts are sufficient to establish personal jurisdiction only if there is some act by which the defendant purposefully avails himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *Id.* at 1233–34 (citing *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), *reh'g denied*). Only the acts of the defendant, and not the acts of a third party or plaintiff, satisfy this requirement. *Id.* at 1234.

██ Thus, courts apply a two-part test to determine whether personal jurisdiction exists consistent with the Due Process Clause. *Id.* First, courts must look at the contacts between the defendant and the forum state to determine if they are sufficient to establish that the defendant could "reasonably anticipate being haled into court there." *Id.* (citations omitted). Second, if the contacts are sufficient, then the court must evaluate whether the exercise of personal jurisdiction offends "traditional notions of fair play and substantial justice" by weighing a variety of interests. *Id.* (citation omitted). Therefore, we will review each part of the federal due process inquiry.

**1. *Minimum Contacts***

██ In analyzing a defendant's contacts, there are two concepts that courts use in their determination of whether the "minimum contacts" are satisfied: general jurisdiction and specific jurisdiction. *Id.* at 1234. General jurisdiction exists if the defendant's contacts with the state are unrelated to the subject matter of the lawsuit. *Id.* Specific jurisdiction is present if the defendant has contacts related to the subject matter of the lawsuit. *Id.* In this case, both sides agree that the "minimum contacts," if they can be established at all, must be established under the theory of

specific jurisdiction. *See* Appellant's Brief at 7; Appellee's Brief at 11; Appellant's Reply Brief at 2, 7. Therefore, we analyze the issue of specific personal jurisdiction in this case.

 Specific personal jurisdiction is "[j]urisdiction that stems from the defendant's having certain minimum contacts with the forum state so that the court may hear a case whose issues arise from those minimum contacts." *Anthem,* 730 N.E.2d at 1235 (quoting BLACK'S LAW DICTIONARY 857 (7th ed.1999)). Contacts are any "acts physically performed in the forum state and acts performed outside the forum state that have an effect within the forum" state. *Id.* (citation omitted). A single contact with a forum state may be enough to establish specific personal jurisdiction if it creates a substantial connection with the forum state and the suit is based upon that connection. *Id.* However, the act must be purposeful, not random, fortuitous, or attenuated, nor may it be the unilateral activity of another party or a third person. *Id.*

 The analysis of contacts for specific personal jurisdiction is fact-specific and determined on a case-by-case basis. *Id.* The plaintiff bears the burden of establishing "minimum contacts." *Id.* at 1237. Factors to consider when evaluating the defendant's contacts with the forum state are: (1) whether the claim arises from the defendant's forum contacts; (2) the overall contacts of the defendant or its agent with the forum state; (3) the foreseeability of being haled into court in that state; (4) who initiated the contacts; and (5) whether the defendant expected or encouraged contacts with the state. *Id.* at 1236. "In sum, when evaluating issues of specific personal jurisdiction, the court must examine the quality and nature of the activities taking place within the state to determine if they are related to the basis of the lawsuit and the result of deliberate conduct by the defendant." *Id.* "Jurisdiction ... may not be avoided merely because the defendant did not *physically* enter the forum State." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985).

Here, Terry's overall contacts with Indiana include writing nineteen checks drawn from an Indiana bank; contacting the bank to change the mailing address for the bank statements; contacting the bank to transfer funds between James's credit union accounts; participating in the transfer of James's certificate of deposit from his Indiana Bank One account to Modern Woodman to purchase an annuity on which Terry was the beneficiary; and signing a consent to unsupervised administration of James's estate that was filed in an Indiana court. The underlying claim, Bert's petition to recover assets, which alleges that the funds from the checks written by Terry and from the transferred certificate of deposit are part of James's estate, arises from Terry's contacts with Indiana. In addition, Terry's actions in writing the nineteen checks from the Indiana bank, and thereby requesting that the bank transfer the funds and make a payment to the listed payee, were clearly not a random or fortuitous act. Furthermore, Terry wrote a $5,000.00 check and a $2,500.00 check to his own business as a "loan" and an $11,000.00 check to both his wife and himself as a "gift" from James's Indiana bank account, and he signed a consent to unsupervised administration of James's estate. Appellant's Appendix at 93–94, 100–101. Under these facts, we cannot say that it was unreasonable for Terry to anticipate being haled into the Indiana probate court that was administering James's

estate.[4] *See, e.g., Saler,* 800 N.E.2d at 968–969 (holding that it was not unforeseeable that the out-of-state beneficiaries could be haled into an Indiana court to account for their actions in initiating and pursuing contacts with an Indiana bank); *Brockman v. Kravic,* 779 N.E.2d 1250, 1258–1259 (Ind.Ct.App.2002) (holding that although the out-of-state defendant did not initiate the contact he had with an Indiana resident, "he did have a purposeful contact with Indiana when he mailed the letters there and voluntarily inserted himself into legal proceedings being conducted in Indiana by an Indiana court"). Therefore, we conclude that Terry had sufficient minimum contacts to confer the Allen County probate court with specific personal jurisdiction over him.

### 2. *Fair Play and Substantial Justice*

 We now turn to the second part of the due process inquiry and examine whether asserting personal jurisdiction over Terry offends traditional notions of fair play and substantial justice. *Anthem,* 730 N.E.2d at 1236. In doing so, we must balance the following factors to determine whether the assertion of jurisdiction is reasonable and fair: (1) the burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Id.* The defendant carries the burden of establishing that asserting jurisdiction is unfair and unreasonable. *Id.* at 1237. To determine if the exercise of personal jurisdiction is reasonable in a particular case, we may examine the relationship among the defendant, the forum, and the litigation, the principles of interstate federalism, and the existence of an alternative forum to hear the dispute. Id.

First, given the fact that Terry is a resident of Georgia, a burden will be placed on Terry by having to defend against Bert's recovery of assets action in Indiana. However, "we acknowledge that with the advancements in travel and communication technology, defending oneself in another state than where one resides is not as severe a burden as it once was." *Saler,* 800 N.E.2d at 970.

---

4. In support of his argument that his writing the checks drawn from an Indiana bank did not constitute sufficient minimum contact with Indiana, Terry relies, in part, upon *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). In *Helicopteros,* the defendant, a Columbian corporation, was the recipient of a check drawn from a Texas bank, and a Texas trial court denied the defendant's motion to dismiss for lack of personal jurisdiction. *Helicopteros,* 466 U.S. at 410, 104 S.Ct. at 1870. The Supreme Court held that "acceptance ... of checks drawn on a Texas bank is of negligible significance for purposes of determining whether [the defendant] had sufficient contacts in Texas" and that "the bank on which a check is drawn is generally of little consequence to the payee and is a matter left to the discretion of the drawer." *Id.* at 416–417, 104 S.Ct. at 1873.

We find *Helicopteros* distinguishable. First, in that case, the Court was analyzing the defendant's contacts in relation to general personal jurisdiction. *Id.* at 415–416, 104 S.Ct. at 1872–1873 ("All parties to the present case concede that [the plaintiffs'] claims against [the defendant] did not 'arise out of,' and are not related to, [the defendant's] activities within Texas. We thus must explore the nature of [the defendant's] contacts with the State of Texas to determine whether they constitute ... continuous and systematic general business contacts ...."). Here, however, Terry's contacts at issue are being analyzed in relation to specific personal jurisdiction. In addition, unlike the defendant in *Helicopteros,* who had no control over the location of the bank from which it received the check, here, Terry used his discretion as the drawer of the check and wrote the checks from the Indiana bank.

Second, we disagree with Terry's claim that "Indiana has little, if any, interest in adjudicating this dispute." Appellant's Brief at 11. The assets that are the basis of the underlying petition to recover assets originated in Indiana and, according to Bert's petition to recover assets, were part of James's estate, which is being administered in an Indiana probate court. *See Saler*, 800 N.E.2d at 970 (noting that the facts that the disputed assets originated in Indiana and were transferred in violation of the decedents' will that was being administered in Indiana weighed in favor of Indiana's interest in adjudicating the dispute). Indeed, James's estate is currently being probated in an Indiana court, Terry has already consented to the unsupervised administration of James's estate in the Indiana probate court, and this claim relates to funds that are alleged to be part of that estate.

Third, Bert's interest in obtaining convenient and effective relief is compelling, especially given his role as personal representative of James's estate, which requires Bert to have contact with the Indiana court. *See id.* (holding that the personal representative, who did not reside in Indiana, had a "compelling" interest in obtaining relief in Indiana). *See also* Ind. Code § 29–1–13–1 (providing that "[e]very personal representative shall have a right to, and shall take, possession of all the real and personal property of the decedent"); Ind.Code § 29–1–12–1 (providing that "every personal representative shall prepare a verified inventory ·... of each item of property of the decedent[,]" including bank accounts).

Fourth, Indiana would provide an efficient resolution of the controversy because this is not a situation where litigation has already started on this case in another state. *See LinkAmerica Corp. v. Cox*, 828 N.E.2d 388, 396 (Ind.Ct.App.2005) (holding

that Indiana would provide an efficient resolution of the controversy because there was no other pending litigation in another state). *Cf. American Econ. Ins. Co. v. Felts*, 759 N.E.2d 649, 659 (Ind.Ct.App. 2001) (holding that Indiana would not provide the most efficient resolution of the controversy because an Illinois court was already addressing the precise issue sought to be litigated in Indiana). James's estate is currently being probated in an Indiana court, Terry has already consented to the unsupervised administration of James's estate in the Indiana probate court, and this claim relates to funds that are alleged to be part of that estate.

Lastly, Terry carries the burden of establishing that asserting jurisdiction is unfair and unreasonable, *see Anthem*, 730 N.E.2d at 1237, but has proffered no fundamental social policies at issue in this case. However, as we stated in *Saler*, "we cannot ignore the necessity of courts in states where an estate is being administered to ensure that property which may appropriately be part of an estate is not removed from the estate and taken across state lines where it cannot be reached." *Saler*, 800 N.E.2d at 970.

After balancing all the factors, we conclude that Terry has failed to present a compelling case that it would be unfair and unreasonable for an Indiana court to exercise jurisdiction over him. Overall, we conclude that exercising jurisdiction over Terry would not offend notions of fairness and reasonableness.

In sum, we find that the two-prong test for personal jurisdiction—Ind. Trial Rule 4.4(A) and the federal due process analysis—has been satisfied. Accordingly, the probate court did not err by denying Terry's motion to dismiss for lack of personal jurisdiction.

For the foregoing reasons, we affirm the probate court's order denying Terry's mo-

tion to dismiss for lack of personal juris-
diction.

Affirmed.

DARDEN, J. and BAILEY, J. concur.